**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

ANGELO GONZALES                                       CIVIL ACTION

VERSUS                                                CASE NO. 15-2145

RIVER VENTURES, LLC                                   SECTION: "G"(1)

### JUDGMENT AND REASONS

This matter came before the Court for trial without a jury from October 24, 2016, to October 25, 2016.[1] The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1333(1), which confers on the federal district courts original jurisdiction over admiralty and maritime claims, and pursuant to 33 U.S.C. § 905(b) of the Longshore and Harbor Workers' Compensation Act ("LHWCA").[2] Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as Defendant River Ventures, LLC ("River Ventures") resides in the Eastern District of Louisiana.[3] The substantive law applicable to this case is the LHWCA, 33 U.S.C. § 901, *et seq.*, and the general maritime law.[4]

The Court has carefully considered the testimony of all of the witnesses and the exhibits entered into evidence during the trial, as well as the record. After reviewing all of the evidence and pursuant to Federal Rule of Civil Procedure Rule 52(a), the Court issues the following findings of

---

[1] Rec. Doc. 81.

[2] Rec. Doc. 1 at 1; Rec. Doc. 43 at 8; Rec. Doc. 78 at 3.

[3] *See* Rec. Doc. 1 at 1; Rec. Doc. 78 at 2.

[4] *See* Rec. Doc. 1 at 1; Rec. Doc. 43 at 8; Rec. Doc. 44 at 5.

fact and conclusions of law. To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

## I. BACKGROUND

In this litigation, Gonzales, an employee of Intervenor United Bulk Terminals Davant, LLC ("UBT"), seeks damages for injuries sustained on June 17, 2014, while being transported on a vessel by Defendant River Ventures.[5] As a result of this accident, Gonzales asserted a claim against Intervenor American Longshore Mutual Association, Ltd. ("ALMA") and UBT (collectively, "Intervenors") pursuant to the LHWCA.[6] Intervenors contend that ALMA, on behalf of UBT, made payments to Gonzales in connection to these injuries pursuant to the LHWCA.[7]

On June 16, 2015, Gonzales filed a complaint in this matter against River Ventures.[8] ALMA and UBT intervened on December 1, 2015, and March 10, 2016, respectively.[9] No dispositive motions were filed. On October 13, 2016, ALMA filed a motion in limine to preclude Jerry Hannah, president of River Ventures, from testifying about matters it believed constituted parol evidence regarding the contract between River Ventures and UBT.[10] The Court took the motion under advisement prior to trial.[11] River Ventures chose not to call Jerry Hannah as a

---

[5] *See* Rec. Doc. 1 at 2; Rec. Doc. 43 at 1.

[6] Rec. Doc. 78 at 4.

[7] *Id.*

[8] Rec. Doc. 1.

[9] Rec. Docs. 10, 20.

[10] Rec. Doc. 66.

[11] *See* Rec. Doc. 87 at 16.

witness during the trial, which rendered the motion moot.[12] On October 19, 2016, River Ventures filed a motion to exclude the "surprise" expert testimony of Dr. Charles Haddad.[13] River Ventures also filed a motion to continue the trial based on Dr. Haddad's allegedly new testimony on October 20, 2016.[14] The Court denied both motions.[15] A trial without a jury was held from October 24, 2016, to October 25, 2016.[16]

On November 7, 2016, the Court ordered the parties to submit supplemental post-trial briefing, if necessary.[17] On November 20, 2016, ALMA filed a post-trial memorandum.[18] On November 21, 2016, Gonzales filed a post-trial memorandum.[19] On December 8, 2016, River Ventures filed a post-trial memorandum,[20] and on December 9, 2016, ALMA and UBT filed a reply.[21] On December 12, 2016, Gonzales filed a reply.[22]

---

[12] *See* Rec. Doc. 87 at 271.

[13] Rec. Doc. 67.

[14] Rec. Doc. 70.

[15] Rec. Doc. 77.

[16] Rec. Doc. 81.

[17] Rec. Doc. 84.

[18] Rec. Doc. 85.

[19] Rec. Doc. 86.

[20] Rec. Doc. 92.

[21] Rec. Doc. 93.

[22] Rec. Doc. 94.

## II. FINDINGS OF FACT

**A.     The Parties**

1.      Plaintiff Angelo Gonzales is a resident of the Parish of St. Bernard, Louisiana.[23]

2.      Defendant River Ventures, LLC is a Louisiana limited liability company with its principal place of business in St. Amant, Louisiana.[24]

3.      Intervenor United Bulk Terminals Davant, LLC is a Louisiana limited liability company with its principal place of business in Davant, Louisiana.[25]

4.      Intervenor American Longshore Mutual Association, Limited is a mutual association, organized and existing under the laws of Bermuda.[26]

**B.     The Relationships Between the Parties**

5.      Gonzales has been employed by UBT as an electrician since 2012.[27]

6.      Gonzales has worked as an electrician for 40 years, including 14 years as a marine electrician and supervisor at Avondale Shipyards prior to being employed by UBT in 2012.[28]

---

[23] This fact is uncontested. *See* Rec. Doc. 78, Pre-Trial Order, at 2.

[24] This fact is uncontested. *See id.*

[25] This fact is uncontested. *See id.*

[26] This fact is uncontested. *See id.*

[27] *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 159:10–159:13; Rec. Doc. 78, Pre-Trial Order, at 5.

[28] *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 159:10–159:20, 181:17–181:25.

7.     UBT transfers coal to and from river barges and oceangoing vessels and maintains stockpiles of coal at several land-based storage areas.[29]

8.     UBT owns and operates several docks in Davant, Louisiana, on the Mississippi River on which vessels may be moored and equipment may be stored.[30]

9.     While working for UBT, Gonzales was responsible for performing general electrical maintenance on all UBT equipment, including the equipment located on UBT's docks.[31]

10.    River Ventures, a crew boat/transport vessel company, contracted with UBT to provide transportation for UBT employees on the Mississippi River.[32]

11.    The General Agreement contract between River Ventures and UBT was in effect and controlling at the time of the incident that is the subject of this litigation.[33]

12.    ALMA insured UBT for claims arising under the Longshore and Harbor Workers' Compensation Act.[34]

## C.    River Ventures' Vessel: The M/V TROOPER

13.    River Ventures owned and operated the vessel "the M/V TROOPER."[35]

---

[29] *See* Test. of Perry Triche, Trial Tr., Oct. 24, 2016, at 43:18–43:23.

[30] *See id.* at 43:20–44:12; Rec. Doc. 78 at 3.

[31] *See* Test. of Perry Triche, Trial Tr., Oct. 24, 2016, at 160:4–160:11.

[32] This fact is uncontested. *See* Rec. Doc. 78, Pre-Trial Order, at 3, 5.

[33] This fact is uncontested. *See id.* at 5.

[34] This fact is uncontested. *See id.*

[35] This fact is uncontested. *See id.*

14.     River Ventures used the M/V TROOPER to transport UBT employees between work sites.[36]

15.     The M/V TROOPER includes a large open deck on the stern of the ship with handrails on both the port and starboard corners of the stern of the deck.[37]

16.     The captain's wheelhouse, which is a covered structure with several windows installed where the captain operates the vessek, is located at the bow of the ship.[38]

17.     The captain sits inside the wheelhouse cabin on the port side of the vessel.[39]

18.     The M/V TROOPER is also equipped with an off-loading platform constructed on the top of the captain's wheelhouse.[40]

19.     The off-loading platform on the M/V TROOPER is used to offload personnel onto docks that are raised above the regular deck of the vessel.[41]

20.     The platform was equipped with a metal grated floor and handrails on both sides, with openings in the handrails on both the port and starboard sides of the platform to allow passengers to disembark from the platform either way and an opening for the ladder entrance.[42]

---

[36] This fact is uncontested. *See id.*

[37] *See* Rec. Doc. 82, Plaintiff's Exhibit Number One, at 1 (Annotated Photograph of the M/V TROOPER (Stern view)); Rec. Doc. 82, Plaintiff's Exhibit Number Three, at 1 (Photograph of the M/V TROOPER (angled photograph)); Rec. Doc. 82, Intervenor's Exhibit Number Eight, at 1 (Annotated Photograph of the M/V TROOPER).

[38] *Id.*

[39] *See* Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 121:12–121:16.

[40] *See* Rec. Doc. 43, Plaintiff's Suggested Findings of Fact and Conclusions of Law, at 2; Rec. Doc. 44, River Ventures, LLC's Proposed Findings of Fact and Conclusions of Law, at 2.

[41] *See* Rec. Doc. 78, Plaintiff's Suggested Findings of Fact and Conclusions of Law, at 2.

[42] *See* Rec. Doc. 82, Plaintiff's Exhibit Number One, at 1 (Annotated Photograph of the M/V TROOPER

21.  To reach the top of the platform to disembark, a passenger must first climb a ladder on the starboard side of the vessel onto an intermediate stage on the back half of the wheelhouse, walk across the intermediate stage of the wheelhouse to the port side of the vessel, and then climb a second ladder to the top of the platform.[43]

**D.  The Events of June 17, 2014: Gonzales boards the vessel**

22.  On June 17, 2014, Gonzales was working for UBT as a Class A electrician.[44]

23.  On June 17, 2014, Noble Ruffin ("Captain Ruffin") was an employee of River Ventures and the captain of the M/V TROOPER.[45]

24.  Captain Ruffin had been a captain at River Ventures for approximately six months prior to the incident on June 17, 2014.[46]

25.  On June 17, 2014, Gonzales requested that Captain Ruffin transport him and some equipment to the "F boom" dock operated by UBS.[47]

26.  Gonzales instructed Captain Ruffin on where he should be dropped off.[48]

---

(Stern view)); Rec. Doc. 82, Plaintiff's Exhibit Number Three, at 1 (Photograph of the M/V TROOPER (angled photograph)); Rec. Doc. 82, Intervenor's Exhibit Number Eight, at 1 (Annotated Photograph of the M/V TROOPER); Rec. Doc. 44, River Ventures, LLC's Proposed Findings of Fact and Conclusions of Law, at 2–3.

[43] *See id.*

[44] *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 160:1–160:4.

[45] This fact is uncontested. *See* Rec. Doc. 78, Pre-Trial Order, at 3, 5; Rec. Doc. 43, Plaintiff's Suggested Findings of Fact and Conclusions of Law, at 1.

[46] *See* Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 116:8–116:25.

[47] *See* Test. of Perry Triche, Trial Tr., Oct. 24, 2016, at 81:13–81:19; Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 161:5–162:10, 185:6–185:17; Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 117:13–119:25, 151:21–151:24.

[48] *See* Test. of Todd Ferniz, Trial Tr., Oct. 24, 2016, at 91:16–91:24; Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 117:13–119:25, 151:21–151:24; Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 185:6–185:17.

27. Captain Ruffin piloted the M/V TROOPER to the barge where Gonzales was waiting to depart.[49]

28. Captain Ruffin backed the stern of the M/V TROOPER up to the barge and tied up the M/V TROOPER to the barge.[50]

29. The M/V TROOPER was level with the barge where Gonzales was awaiting transport, such that he could walk directly from the barge onto the deck.[51]

30. Gonzales and Steve Rivera ("Rivera"), another UBT employee, loaded equipment and material from the barge onto the M/V TROOPER.[52]

31. Gonzales proceeded to walk onto the stern of the M/V TROOPER to be transported.[53]

32. Rivera did not board the M/V TROOPER and instead walked to meet Gonzales at his destination at UBT's "F boom" dock.[54]

33. Todd Ferniz ("Ferniz"), another UBT employee, boarded the M/V TROOPER with Gonzales.[55]

---

[49] *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 161:3–161:13.

[50] *See id.* at 161:11–161:13.

[51] *See id.* at 161:11–161:16.

[52] *See id.* at 161:11–161:25; Rec. Doc. 44, River Ventures, LLC's Proposed Findings of Fact and Conclusions of Law, at 2.

[53] *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 161:14–161:24; Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 119:8–119:19.

[54] *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 161:20–161:25.

[55] *See id.* at 161:24–161:25; Rec. Doc. 44, River Ventures, LLC's Proposed Findings of Fact and Conclusions of Law, at 2.

**E.      The Events of June 17, 2014: Gonzales attempts to disembark from the vessel**

34.      Captain Ruffin piloted the M/V TROOPER from the barge to the "F boom" dock with Gonzales and Ferniz on board.[56]

35.      Captain Ruffin backed the stern end of the M/V TROOPER to the "F boom" dock.[57]

36.      Rivera was already on the "F boom" dock to assist Gonzales and Ferniz with unloading equipment from the M/V TROOPER.[58]

37.      Gonzales and Ferniz proceeded to hand the equipment on the back deck of the M/V TROOPER to Rivera on the "F boom" dock.[59]

38.      After the equipment was off-loaded, Gonzales needed to use the offloading platform above the vessel's wheelhouse to disembark from the M/V TROOPER to the "F boom" dock, as the back deck of the M/V TROOPER was several feet below the dock.[60]

39.      Gonzales and Ferniz remained on the M/V TROOPER while Captain Ruffin began maneuvering the M/V TROOPER.[61]

40.      While the M/V TROOPER was positioned with its stern against the dock, Captain Ruffin attempted to pivot the vessel starboard such that the starboard side of the offloading platform and vessel would be flush with the dock.[62]

---

[56] *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 162:6–162:11.

[57] *See id.* at 162:9–162:11.

[58] *See id.* at 162:11–162:13.

[59] *See id.*

[60] *See id.* at 186:11–186:16; Test. of Perry Triche, Trial Tr., Oct. 24, 2016, at 63:13–63:20.

[61] *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 162:17–22.

[62] *See id.*

41. This maneuver is referred to as "walking" the vessel in order to re-position the vessel to let passengers off from the top of the offloading platform.[63]

42. On June 17, 2014, at the time of the instant incident, the Mississippi River was "rough" and "running high," such that the water level was higher than normal and the river was moving faster.[64]

43. Captain Ruffin attempted to "walk" the M/V TROOPER over several times in the rough waters so that the starboard side of the vessel would be flush with the dock.[65]

44. While Captain Ruffin was performing this maneuver and the vessel was still moving, Gonzales proceeded to climb up the two ladders on the M/V TROOPER to the top of the offloading platform.[66]

45. Passengers are not supposed to climb up onto the offloading platform until the captain signals for them to do so.[67]

---

[63] *See* Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 122:7–122:10.

[64] *See id.* at 126:18–126:23, 129:12–129:21; Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 186:11–186:16; Test. of Perry Triche, Trial Tr., Oct. 24, 2016, at 56:11–57:6, 63:13–63:20.

[65] *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 163:19–163:21; Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 126:18–126:20.

[66] *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 163:9–163:14 (Gonzales testifying that he "proceeded to get up on the ramp, anticipating [Captain Ruffin] docking up against the side of the boat so [he] can get off"); *id.* at 186:7–186:10.

[67] *See* Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 122:13–123:3 (stating that passengers "shouldn't get up [on the offloading platform] until I tell them to get up there" and that he would signal to the passengers when it was time to get on the platform "every time somebody would get up on that [platform]"); Test. of Perry Triche, Trial Tr., Oct. 24, 2016, at 82:23–82:25 (Q: "When that transfer is being made—I would assume you have to wait until it's safe to do that. Wouldn't you?" A: "Yes, sir.").

46.	Gonzales did not inform Captain Ruffin that he was climbing up to the offloading platform.[68]

47.	Captain Ruffin, who was inside the vessel's wheelhouse, was not aware that Gonzales had climbed up onto the offloading platform above the wheelhouse.[69]

48.	Ferniz remained on the deck of the M/V TROOPER and held on to the handrails because he "didn't want to get thrown into the river."[70]

49.	While Captain Ruffin was attempting to turn the M/V TROOPER to be flush with the dock, the M/V TROOPER bumped hard against the dock several times.[71]

50.	Captain Ruffin did not warn his passengers to watch for the bump.[72]

51.	Bumping against the dock while "walking" a vessel over is common when performing this maneuver.[73]

---

[68] *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 186:7–186:10 (Q: "When you went to the top and you climbed up here to the top, you did not tell the captain you were going up there, did you?" A: "No, I did not.").

[69] *See* Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 128:20–130:13, 138:15–138:17, 143:1–143:5. The Court further notes that Gonzales also testified that the passenger must signal to the captain through the window that they have successfully disembarked before the captain knows that he can depart. *See id.* at 163:13–163:18.

[70] *See* Test. of Todd Ferniz, Trial Tr., Oct. 24, 2016, at 114:1–114:10.

[71] *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 165:7–165:11 (saying the vessel hit the dock "real hard"); Test. of Todd Ferniz, Trial Tr., Oct. 24, 2016, at 93:6–93:16, 101:1–101:25. While Captain Ruffin testified that he only bumped against the dock once and it was not a hard physical strike, *see* Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 126:18–126:20, the Court credits the testimony of Angelo Gonzales and Todd Ferniz on this point, who both testified that the vessel struck the dock multiple times that day with at least some force.

[72] *See* Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 141:17–141:19.

[73] *See id.* at 146:24–146:25 ("Was the bump or bumps pretty typical and common? Yes, sir."); Test. of Todd Ferniz, Trial Tr., Oct. 24, 2016, at 104:8–104:12 (Ferniz stating that he was holding on while Captain Ruffin was "walking" the vessel because he "knew there was going to be a shock and bounce"); Test. of Perry Triche, Trial Tr., Oct. 24, 2016, at 68:6–69:17 (stating that it was "true" that sometimes the captain will bump a vessel against the dock once or twice while maneuvering the vessel); Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 182:18–183:1 (agreeing that he is aware that boats might bump against the dock when docking).

52.     While "walking" the vessel, Captain Ruffin did not accelerate the M/V TROOPER or otherwise increase its speed beyond what was necessary to turn the vessel's starboard side to be parallel with the dock.[74]

53.     While Captain Ruffin was attempting to dock the M/V TROOPER, Gonzales remained on top of the offloading platform and tried to communicate to Ferniz that Captain Ruffin should proceed to an alternative location to offload Gonzales.[75]

54.     Because the vessel had two diesel engines operating and creating noise, Captain Ruffin did not hear Gonzales climb on top of the offloading platform or hear Gonzales' suggestions to Ferniz that Captain Ruffin proceed to a new drop off location.[76]

55.     Gonzales had the "stop-work authority" to immediately end the work being done because an employee feels like he is in an unsafe situation, but Gonzales failed to utilize it when he was on the offloading platform while the vessel was moving.[77]

56.     It was Gonzales' obligation as a UBS employee to use his "stop-work authority" to immediately end a situation that Gonzales felt was unsafe.[78]

---

[74] *See* Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 128:20–130:13 ("Well, I was coming in. I didn't have that much to do, so I put my engines in forward and I left one in reverse. I kind of let it walk."); Test. of Perry Triche, Trial Tr., Oct. 24, 2016, at 67:19–68:5.

[75] *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 164:10–165:6.

[76] *See* Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 129:22–130:11; Test. of Todd Ferniz, Trial Tr., Oct. 24, 2016, at 102:1–102:8.

[77] *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 184:6–185:5; Test. of Perry Triche, Trial Tr., Oct. 24, 2016, at 70:3–70:20.

[78] *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 184:6–185:5 (Q: "You certainly had the right and obligation to [use your 'stop-work authority'], true?" A: "True."); Test. of Perry Triche, Trial Tr., Oct. 24, 2016, at 71:4–71:7 (Q: "It was Mr. Gonzales' job, it was his obligation to do that if he felt it was unsafe, wasn't it?" A: "If he felt it was unsafe, yes, sir."); *id.* at 59:15–60:10 (Q: "You would agree with me that Mr. Gonzales' obligation is to not put himself or others at risk by jumping from that rack to the dock?" A: "Yes, sir.").

57.  While on top of the offloading platform, Gonzales was holding a bag in one hand.[79]

58.  While Captain Ruffin continued to try to "walk" the M/V TROOPER to be flush against the "F boom" dock, Ferniz saw that Gonzales was preparing to jump down from the offloading platform to the dock before Captain Ruffin had completed the maneuver or had signaled to Gonzales that it was safe to climb onto the platform or disembark.[80]

59.  Ferniz yelled to Gonzales to not jump.[81]

60.  Because the offloading platform is approximately ten to twelve feet in length, Gonzales had room to safely step several feet back away from the starboard side opening on the platform's walkway.[82]

61.  On the fourth attempt to walk the vessel to the "F boom" dock, when the M/V TROOPER bumped against the dock, Gonzales jumped down to the dock.[83]

---

[79] *See* Test. of Todd Ferniz, Trial Tr., Oct. 24, 2016, at 92:16–92:20 (Q: "After you both got on the boat, was there any equipment on the boat that you were moving too?" A: "I didn't have any. Mr. Angelo had something in his hand. I don't know if it was a work bag or not, but he had something in his hand that I can remember."); *id.* at 111:4–111:5 (Q: "In fact, he also had some tools in his hand, true?" A: "I seen a bag." Q: "So he was really just holding onto the handrail with one and balancing some tools in his other hand, true?" A: "True."); *see also* Test. of Perry Triche, Trial Tr., Oct. 24, 2016, at 83:1–83:4 (Q: "Even when you are transferring from that plank to the dock, at some point you are not going to have three points of contact, correct?" A: "What they would generally do is put their bag down."). Gonzales testified that he did not have anything in his hand when he was on the offloading platform. *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 162:23–163:1. However, the Court credits the testimony of Ferniz on this point, as he could directly see Gonzales and what he was holding.

[80] *See* Test. of Todd Ferniz, Trial Tr., Oct. 24, 2016, at 101:1–102:2, 108:4–108:25.

[81] *See id.* at 101:1–102:2; 108:12–108:25. Gonzales testified that Ferniz's statements that he told Gonzales not to jump were false. *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 195:3–196:24. However, the Court credits Ferniz on this point.

[82] *See* Test. of Perry Triche, Trial Tr., Oct. 24, 2016, at 68:11–69:20; Test. of Todd Ferniz, Trial Tr., Oct. 24, 2016, at 111:18–112:5; Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 148:6–148:22; Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 190:24–192:4.

[83] *See* Test. of Todd Ferniz, Trial Tr., Oct. 24, 2016, at 95:15–95:20, 101:1–102:2; Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 146:17–146:23 ("Todd told me he jumped."). One of the central disputes between the parties at trial was whether Gonzales was thrown from the vessel or attempted to jump down to the dock when he injured himself. As discussed in greater detail *infra*, the Court credits Ferniz's testimony on this point, as he was a

62.     Passengers are prohibited from jumping from the vessel to the dock or putting themselves or others at risk by their actions.[84]

63.     Gonzales landed on his shoulder when he impacted with the dock.[85]

64.     Captain Ruffin did not know that Gonzales was injured and proceeded to transport Ferniz to his location.[86]

65.     Gonzales did not fill out an accident report following his injury.[87]

66.     Following the incident, Ferniz wrote a statement in which he stated: "It was about 1:45 p.m. The crew boat was approaching dock. The electrician pursued to jump. I told him not to, to wait until it is stable. On about the fourth time, the fourth bounce, he jumped onto a pile of rope. He landed on his shoulder. (1) Rope on dock; (2) He fell on rope;

---

direct eye-witness who has credibly maintained since the day of the incident that Gonzales jumped from the vessel. By contrast, the Court is not persuaded by Gonzales' testimony that he fell from the force of the bumps, which is directly contradicted by Ferniz's testimony. Gonzales pointed to little to no corroborating evidence for his story that he was thrown from the vessel, such as damage to the vessel or testimony that Ferniz was also thrown by the fourth bump. Moreover, Gonzales could not remember certain details of the alleged fall such as landing on a pile of rope. *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 197:1–197:8. Likewise, the Court is not persuaded by the testimony of Gonzales' orthopedic surgeon, Dr. Charles Haddad, who testified that Gonzales' story is consistent with his injuries and that Dr. Haddad's "assumption" is that someone who jumps from a vessel is "more likely" to have "some lower extremity injuries." *See* Test. of Charles Haddad Jr., Trial Tr., Oct. 24, 2016, at 224:2–224:21. However, on cross examination, Dr. Haddad conceded that his notes on how the incident occurred were based solely on his interview with Gonzales and that it was "possible" that the injury occurred in a different manner. *See id.* at 257:3–257:19. Thus, because Dr. Haddad was not present at the incident or offered as an expert witness in issues of injury causation, and because Dr. Haddad's testimony was at least partially based on the information gathered from Gonzales, the Court finds that Dr. Haddad's causation testimony to be of little persuasive value.

[84] *See* Test. of Perry Triche, Trial Tr., Oct. 24, 2016, at 57:12–57:14 (Q: "What are the rules regarding whether UBT employees should jump or not jump from vessel to dock?" A: "Don't jump."); *id.* at 60:7–60:13 (Q: "You would agree with me that Mr. Gonzales' obligation is to not put himself or others at risk by jumping from that rack to the dock?" A: "Yes, sir." Q: "That would be a major, major mistake on Mr. Gonzales' part if he jumped, wouldn't it?" A: "Yes, sir."). *See also* Test. of Todd Ferniz, Trial Tr., Oct. 24, 2016, at 109:8–109:16 (Q: "The actions of Mr. Gonzales that you witnessed with your two eyes, by him jumping, was unsafe on his part, true?" A: "True.").

[85] *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 165:14–165:15.

[86] *See* Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 130:11–131:20.

[87] *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 170:19–170:21.

(3) Rope might have saved him."[88]

67.     Accordingly, as discussed in greater detail *infra*, the Court finds that Gonzales was injured because he climbed up onto the offloading platform without informing Captain Ruffin and before the vessel stopped moving and because he attempted to jump down to the dock before the vessel had stopped moving and before the captain had signaled that he could safely disembark.

**F.     The Events of June 17, 2014: Gonzales' Injuries and Medical Treatment**

68.     After landing on the dock, the first responders were called.[89]

69.     Gonzales' shoulder injury caused him significant pain, and he was unable to move his left arm immediately after the injury.[90]

70.     Gonzales walked away from the dock to the vehicle of Johnny Lacrosse, a production supervisor, who brought Gonzales to a first aid room.[91]

71.     Gonzales was taken by Perry Triche, the President of UBT, to Dr. Swift, the "company doctor," who examined Gonzales and ordered x-rays to be taken.[92]

72.     Gonzales was referred to Dr. Charles Haddad, an orthopedic surgeon.[93]

---

[88] *See* Test. of Todd Ferniz, Trial Tr., Oct. 24, 2016, at 101:1–101:10.

[89] *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 169:9–169:11.

[90] *See id.* at 170:10–170:18.

[91] *See id.* at 169:12–169:23.

[92] *See id.* at 170:22–171:7.

[93] *See id.* at 172:5–172:13.

73.    Dr. Charles Haddad determined that there were multiple breaks on Gonzales' shoulder and recommended surgery.[94]

74.    The following week after Gonzales was injured on June 17, 2014, Gonzales underwent surgery at East Jefferson Hospital.[95]

75.    Gonzales remained in pain from his injuries for several months after the surgery.[96]

76.    Following the surgery, Gonzales underwent physical therapy.[97]

77.    Gonzales returned to light duty employment at UBS approximately three months after the incident on June 17, 2014, and remained on light duty for approximately three more months.[98]

78.    Gonzales underwent a second surgery several months later.[99]

### III. CONCLUSIONS OF LAW

Gonzales brings this action against River Ventures pursuant to Section 905(b) of the LHWCA, which permits certain workers engaged in maritime employment and injured on a vessel to bring an action against the vessel owner, and General Maritime Law.[100] All parties agree that

---

[94] *See id.* at 172:14–172:22.

[95] *See id.* at 173:4–173:12.

[96] *See id.* at 173:24–174:3.

[97] *See id.* at 174:5–174:9.

[98] *See id.* at 174:10–175:7.

[99] *See id.* at 175:13–175:23.

[100] *See* Rec. Doc. 78 at 3 (invoking jurisdiction under the General Maritime Law and 33 U.S.C. § 905(b)); *see also* 33 U.S.C. § 905(b); *Ne. Marine Terminal Co. v. Caputo*, 432 U.S. 249, 264 (1977); *Levene v. Pintail Enterprises, Inc.*, 943 F.2d 528, 531 (5th Cir. 1991).

Gonzales was a "longshoreman" pursuant to the LHWCA, 33 U.S.C. § 901, *et seq.*[101] Under Section 905(b), a vessel owner is liable for those damages "caused by the negligence of a vessel," *i.e.* the vessel's failure to exercise reasonable care.[102] Section 905(b) does not define negligence or specify particular acts or omission of a vessel that would constitute negligence.[103] The Fifth Circuit has determined that Section 905(b) was not intended to "create a new or broader cause of action in admiralty," but rather "preserves an injured worker's pre-existing right, under general maritime law, to recover for third-party negligence."[104] Maritime tort cases under this provision are analyzed using general principles of negligence law.[105] Thus, to succeed on his claim against River Ventures, Gonzales must show: (1) River Ventures owed a duty to Gonzales; (2) there was a breach of that duty; (3) causation; and (4) damages.[106]

---

[101] *See* Rec. Doc. 43 at 8 (Gonzales stating that he is a longshoreman bringing a Section 905(b) claim); Rec. Doc. 44 at 5 (River Ventures stating that Gonzales was a longshoreman and brings this action under Section 905(b)).

[102] *See* 33 U.S.C. § 905(b); *Castorina v. Lykes Bros. S.S. Co.*, 758 F.2d 1025, 1031 (5th Cir. 1985) ("Section 905(b) expressly provides that a longshoreman whose injury is caused by the negligence of a vessel may bring a third-party action for damages against the owner of the vessel."); *Smith v. M/V Captain Fred,* 546 F.2d 119, 120 (5th Cir. 1977); *Ducrepont v. Baton Rouge Marine Enterprises, Inc.*, 666 F. Supp. 882, 884 (E.D. La. 1987), *aff'd*, 877 F.2d 393 (5th Cir. 1989).

[103] *Castorina*, 758 F.2d at 1031.

[104] *May v. Transworld Drilling Co.*, 786 F.2d 1261, 1264 (5th Cir. 1986).

[105] *See Deperrodil v. Bozovic Marine, Inc.*, 842 F.3d 352, 356 (5th Cir. 2016); *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980); *Couch v. Cro-Marine Transp., Inc.*, 44 F.3d 319, 324 (5th Cir. 1995) (noting that "the scope of the duty owed by a vessel to longshoremen [under Section 905(b)] was left to 'be resolved through the application of accepted principles of tort law and the ordinary process of litigation'" (citing H.R. Rep. No. 92–1441, 92nd Cong., 2nd Sess. (1972), *reprinted in* 1972 U.S.C.C.A.N. 4698, 4704)); *Gravatt v. City of N.Y.*, 226 F.3d 108, 118 (2d Cir. 2000) (noting that, in amending the LHWCA in 1972, the House Committee determined that third-party negligence actions thereunder would be "developed as a matter of uniform federal maritime law, not by incorporating the tort law of the particular state in which the action arose" (quoting H.R. Rep. No. 92-1441, *reprinted in* 1972 U.S.C.C.A.N. at 4704)).

[106] *See Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000) (citing *In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991)); *DePerrodil v. Bozovic Marine, Inc*, No. 13-849, 2015 WL 8542829, at *2 (W.D. La. Dec. 10, 2015), *aff'd in part, vacated in part on other grounds, remanded sub nom. Deperrodil v. Bozovic Marine, Inc.*, 842 F.3d 352 (5th Cir. 2016).

### A.    Duty

Gonzales argues that, in maritime cases such as this one, a vessel operator owes passengers aboard its vessel a duty of reasonable care under the circumstances to "not negligently injure them, and to warn them of any dangers of which the operator knows or should know."[107]  In particular, Gonzales avers that River Ventures owed Gonzales a duty to provide safe egress from its vessel.[108]

In *Kermarec v. Compagnie Generale Transatlantique*, the Supreme Court held that it is a "settled principle of maritime law that a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew."[109]  The Supreme Court determined that "the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances of each case."[110]  The Fifth Circuit has further held that "shipowners, relatively speaking, are held to a high degree of care for the safety of their passengers."[111]  Thus, here it is clear that River Ventures owed its passenger, Gonzales, a duty of reasonable care under the circumstances, including a duty to provide a safe egress from its vessel and a duty to warn Gonzales

---

[107] *See* Rec. Doc. 43 at 9.

[108] *See id.*; Rec. Doc. 46 at 4.

[109] 358 U.S. 625, 630 (1959) (citations omitted).

[110] *Id.* at 632.

[111] *Deperrodil v. Bozovic Marine, Inc.*, 842 F.3d 352, 357 (5th Cir. 2016) (citations omitted); *Smith v. S. Gulf Marine Co. No. 2*, 791 F.2d 416, 420 (5th Cir. 1986) (determining that, although the Fifth Circuit had previously described the standard of care due to passengers on a vessel in several different ways, shipowners are generally held "to a high degree of care for the safety of passengers").

of any dangers of which River Ventures knew or should have known.[112] Accordingly, Gonzales

has satisfied the first element of his negligence claim.

## B.    *Breach*

Next, Gonzales must establish that River Ventures breached its duty to exercise reasonable

care. According to the Fifth Circuit, the relevant factors to consider when determining whether a

vessel exercised reasonable care under the circumstances include: (1) the experience of the crew;

(2) the type of vessel involved; (3) the risks and dangers to the passengers peculiar to that type of

vessel; (4) the vessel's degree of control over the passengers; and (5) the vessel's ability to take

precautions against such dangers.[113] Here, the M/V TROOPER is a small vessel used to, *inter alia*,

---

[112] *Id.*; *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980). The Court notes that River Ventures cites to *Scindia Steam Navigation Company v. De Los Santos*, 451 U.S. 156, 168–69 (1981) where the Supreme Court held that vessels only owe three limited duties to stevedores: a "turnover duty," an "active control duty," and a "duty to intervene." *See* Rec. Doc. 44 at 6. This Court notes that, while the Fifth Circuit has determined that *Scindia* is "not limited to the stevedoring context," it applies to independent contractors and harborworker employees "covered by the LHWCA and working aboard ship." *Hudson v. Schlumberger Tech. Corp.*, 452 F. App'x 528, 532 (5th Cir. 2011) (citing *Casaceli v. Martech Int'l, Inc.*, 774 F.2d 1322, 1326–27 (5th Cir. 1985)). *See also Fontenot v. McCall's Boat Rentals, Inc.*, 227 Fed. App'x 397, 403 n.2 (5th Cir. 2007) (unpublished) ("This court has held that the principles of *Scindia,* though formulated in the context of the respective duties of vessel owners and stevedores, apply equally to any suit by an LHWCA-covered employee working for an independent contractor aboard a vessel."); *Teply v. Mobil Oil Corp.*, 859 F.2d 375 (5th Cir. 1988) ("The Supreme Court interpreted § 905(b) as it applies to stevedores, but in principle as [sic] it applies to other harborworkers who work on board vessels as well . . . ."). As the Supreme Court noted in *Scindia*, this is because, absent a contract provision, the shipowner has "no general duty by way of supervision or inspection . . . within the confines of the cargo operations that are assigned to the stevedore." *Scindia*, 451 U.S. at 172. However, this case involves a non-stevedore passenger transfer and allegations of vessel operational negligence, rather than injuries for an "employee working for an independent contractor aboard a vessel." *Fontenot*, 227 Fed. App'x at 403 n.2. Thus, the Court will consider whether River Ventures violated the more general "duty of reasonable care under the circumstances." *See Chiasson v. Rogers Terminal & Shipping Corp.*, 679 F.2d 410, 415 (5th Cir. 1982) (affirming a district court's decision to distinguish between negligence attributable to stevedoring services and negligence attributable to the vessel itself); *see also Deperrodil*, 842 F.3d at 357 (applying the general duty to exercise reasonable care in a maritime-tort action for injuries arising out of a plaintiff's being taken to a work site on a vessel operated by the defendant); *Smith*, 791 F.2d at 420 (applying the same standard of care for a passenger of crew boat transporting worker who slipped and fell when attempting to disembark). Moreover, the Court notes that, even assuming River Ventures only owed Gonzales the three duties outlined in *Scindia*, the Court's analysis discussed *infra* would remain the same: that Gonzales has failed to establish that River Ventures breached any duty to Gonzales or that such a breach was causally connected to Gonzales' injury.

[113] *See Deperrodil*, 842 F.3d at 357; *Smith v. So. Gulf Marine Co., No. 2, Inc.*, 791 F.2d 416, 421 (5th Cir. 1986) (citing *Kermarec*, 358 U.S. at 632).

19

transport UBT employees and equipment between work sites.[114] Captain Ruffin, the sole crewmember of the M/V TROOPER, had approximately six months of experience as a captain at the time of the incident, which Ferniz, a UBT employee, characterized as "pretty green" and "fresh."[115] Captain Ruffin exercised significant control over the M/V TROOPER as the captain of the vessel, and passengers were prohibited from climbing aboard the offloading platform until the captain signals that it is safe to do so.[116] However, the UBT employees, including Gonzales, determined both the pick-up and drop-off locations when requesting a transport from River Ventures.[117] River Ventures had also adopted some measures to protect against injuries when passengers disembark from the offloading platform, which, when followed, would allow for an "ordinary," "customary," and "typical safe transfer."[118] As several witnesses testified, these precautionary measures include: prohibiting passengers from climbing up to the offloading platform until the captain signals that it is safe to do so;[119] requiring three points of contact with

---

[114] *See* Rec. Doc. 78, Pre-Trial Order, at 3, 5.

[115] *See* Test. of Todd Ferniz, Trial Tr., Oct. 24, 2016, at 98:20–99:6.

[116] *See* Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 122:13–123:3; Test. of Perry Triche, Trial Tr., Oct. 24, 2016, at 82:23–82:25.

[117] *See* Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 134:15–135:16, 151:21–152:3.

[118] *See* Test. of Perry Triche, Trial Tr., Oct. 24, 2016, at 63:13–63:24, 106:16–106:24; Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 152:4–152:7.

[119] *See id.* at 82:18–82:25 (Q: "When that transfer is being made—I would assume you have to wait until it's safe to do that. Wouldn't you?" A: "Yes, sir.").

the vessel when on a ladder or platform;[120] prohibiting jumping from the offloading platform to the dock;[121] and attending safety meetings.[122]

Here, Gonzales argues that River Ventures breached its duty to exercise reasonable care under the circumstances by failing to provide for a safe transfer for Gonzales.[123] In particular, Gonzales asserts that River Ventures, through Captain Ruffin and the M/V TROOPER, breached its duties by: (1) failing to use an alternative, safer location to drop off Gonzales; (2) failing to warn the passengers to "watch the bump;" (3) bumping the M/V TROOPER hard against the dock;[124] and (4) failing to know where his passengers were positioned on the boat.[125] Gonzales further contends that striking a pier "with sufficient force to throw down" a passenger "is indicative of negligence and poor seamanship," and that there is a presumption of fault against the defendant when a moving vessel strikes a stationary object such as a dock.[126]

In response, River Ventures argues that it did not breach any duty to Gonzales.[127] River Ventures asserts that there is no presumption of a breach in this case from the mere fact that the vessel bumped against the dock, as the "Oregon Rule" is only applicable to unintended vessel

---

[120] *See id.* at 62:21–63:12.

[121] *See id.* at 57:12–57:14, 60:7–60:13; Test. of Todd Ferniz, Trial Tr., Oct. 24, 2016, at 109:8–109:16.

[122] *See* Test. of Perry Triche, Trial Tr., Oct. 24, 2016, at 61:2–62:20.

[123] *See* Rec. Doc. 86 at 1–2; Rec. Doc. 43 at 9.

[124] *See* Rec. Doc. 86 at 2–3; Rec. Doc. 43 at 9 (stating that the vessel and its captain was negligent by "creating a peril Gonzales could not have expected and causing an impact with the dock and causing him to be thrown from the vessel").

[125] *See* Rec. Doc. 86 at 11.

[126] *See* Rec. Doc. 43 at 9–10 (citing *The Oregon*, 158 U.S. 186, 197 (1895); *Bunge Corp v. M/V Furness Bridge*, 558 F.2d 790 (5th Cir. 1977); *Dow Chem. Co. v. Dixie Carriers, Inc*., 463 F.2d 120, 122 n.4 (5th Cir. 1972)).

[127] *See* Rec. Doc. 92 at 8.

allisions where the fixed object's owner has brought a claim for damages.[128] Moreover, River Ventures avers that merely because an incident occurred while a passenger was disembarking does not create a presumption that the egress was not safe, particular when the passenger's own actions allegedly cause the injury.[129] According to River Ventures, this case solely arises from Gonzales' "poor and dangerous choice in climbing to the platform of the River Ventures' M/V TROOPER while the vessel was underway and jumping onto the UBT dock before the vessel had safely landed."[130]

Based on the testimony and evidence presented at trial and for the reasons that follow, the Court finds that Gonzales has not demonstrated by a preponderance of the evidence that River Ventures breached its duties to Gonzales while he was a passenger onboard the M/V TROOPER. Here, Gonzales does not argue, nor does any evidence suggest, that Captain Ruffin breached any duties when he picked Gonzales up, first piloted the M/V TROOPER over to the "F boom" dock, or backed the stern of the vessel up against the dock. Rather, Gonzales asserts that River Ventures' duty to exercise reasonable care was breached when Captain Ruffin "walked" the M/V TROOPER over to the dock, *i.e.* turned the vessel from having its stern against the dock to having its starboard side parallel with the dock.[131]

---

[128] *Id.*

[129] *Id.* at 10–11.

[130] *Id.* at 1.

[131] *See* Rec. Doc. 86 at 2–3; Rec. Doc. 43 at 9; *see also* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 167:13–168:12 (stating that the vessel came into contact with the dock with enough force to throw him sideways off the platform and onto the dock).

However, while the Court credits Gonzales' and Ferniz's testimony that Captain Ruffin attempted to "walk" the M/V TROOPER over to the dock multiple times,[132] the Court finds that Gonzales has failed to establish that such actions constitute a breach of River Ventures' duty to Gonzales. First, the testimony shows that Gonzales, as a UBT employee, determined where he would be picked up and dropped off by River Ventures, and that it was Gonzales who instructed Captain Ruffin to transport him to the "F boom" dock.[133] Moreover, Gonzales failed to show that Captain Ruffin's decision to take Gonzales to the "F boom" dock was itself negligent in light of either his experience or the water conditions that day, or that it was negligent for Captain Ruffin to continue attempting to "walk" the vessel over instead of piloting the vessel to an alternative location. No witness testified that this maneuver was uncommon or should not have been performed.[134] Likewise, there was no testimony that Captain Ruffin should have left the "F boom" dock and piloted the M/V TROOPER to another location if he did not successfully dock the vessel on the first try. Rather, the Court credits the testimony that, once Captain Ruffin succeeded in turning the vessel, Gonzales could have safely stepped off from the vessel to the dock, and that this maneuver was typical, ordinary, and customary.[135]

---

[132] *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 165:7–165:20; Test. of Todd Ferniz, Trial Tr., Oct. 24, 2016, at 107:13–107:20.

[133] *See* Test. of Todd Ferniz, Trial Tr., Oct. 24, 2016, at 91:16–91:24; Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 117:13–119:25, 151:21–151:24; Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 185:6–185:17

[134] *See* Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 122:7–122:9, 146:15–146:25 (describing the practice of "walking" a vessel); Test. of Perry Triche, Trial Tr., Oct. 24, 2016, at 67:16–68:10 (agreeing that "many times" a captain of a vessel will "walk" into the dock).

[135] *See* Test. of Todd Ferniz, Trial Tr., Oct. 24, 2016, at 106:16–106:24 (Q: "In this particular instance, if the vessel had landed up against the dock and Mr. Gonzales had not jumped, he could have safely stepped off, no problem? It was a typical step, true?" A: "I can't say what he would have did. That's Mr. Gonzales." Q: Understood. From your view, if the vessel had landed and he had safely stepped off, he could have safely done it?" A: "Yes." Q: "Typical, ordinary, customary?" A: "Yes."); Test. of Perry Triche, Trial Tr., Oct. 24, 2016, at 63:13–63:24 (agreeing that it is a "typical safe transfer" for a passenger to disembark from the platform down about two feet to the dock after the

Second, while the Court also credits Gonzales' and Ferniz's testimony that the vessel bumped against the dock more than once,[136] the Court finds that Gonzales did not establish that bumping against the dock constitutes a failure to exercise reasonable care under the circumstances or that Gonzales had a duty to warn Gonzales of the bumps. Instead, several witnesses, including Gonzales, testified that bumping against the dock is a typical and common occurrence while docking or "walking" the vessel.[137] As the Fifth Circuit has repeatedly held, "[a] vessel owner does not need to warn passengers or make special arrangements for open-and-obvious risks."[138] For example, in *Superior Oil Company*, the Fifth Circuit held that a seaman acted negligently when he attempted to jump between two vessels, as he was "an experienced seaman [who] should have been fully cognizant of the danger involved" and should have avoided the obvious risk of jumping.[139]

Here, the testimony established that bumping against a dock while "walking" the vessel and docking is a common and expected occurrence, and thus constitutes an "open-and-obvious

---

vessel was "walked" over).

[136] *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 165:7–165:11; Test. of Todd Ferniz, Trial Tr., Oct. 24, 2016, at 93:6–93:16, 101:1–101:25.

[137] *See* Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 146:24–146:25 (Q: "Was the bump or bumps pretty typical and common?" A: "Yes, sir."); Test. of Todd Ferniz, Trial Tr., Oct. 24, 2016, at 104:8–104:12 (Ferniz stating that he was holding on while Captain Ruffin was "walking" the vessel because he "knew there was going to be a shock and bounce"); Test. of Perry Triche, Trial Tr., Oct. 24, 2016, at 68:6–69:17 (stating that it was "true" that sometimes the captain will bump a vessel against the dock once or twice while maneuvering the vessel); Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 182:18–183:1 (agreeing that he is aware that boats might bump against the dock when docking).

[138] *Deperrodil v. Bozovic Marine, Inc.*, 842 F.3d 352, 357 (5th Cir. 2016) (citing *Massey v. Williams–McWilliams, Inc.*, 414 F.2d 675, 678–79 (5th Cir. 1969); *Superior Oil Co. v. Trahan*, 322 F.2d 234, 237 (5th Cir. 1963); *Counts v. Lafayette Crewboats, Inc.*, 622 F.Supp. 299, 301 (W.D. La. 1983)); *see also Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000) (determining that a shipper had no duty to warn the shipowner of hazards of which the shipowner was aware or could reasonably have been expected to be aware).

[139] *Superior Oil Co.*, 322 F.2d at 237.

risk." This is particularly true for passengers with significant maritime experience and familiarity with the M/V TROOPER such as Gonzales.[140] For instance, Ferniz testified that he was holding on to the handrail on the back deck of the vessel when Captain Ruffin first began "walking" the vessel because Ferniz "knew there was going to be a shock and bounce."[141] Accordingly, this case is analogous to *Superior Oil Company* in that Gonzales, an experienced maritime electrician who was familiar with the M/V TROOPER, should have been cognizant of the risk of bumping against the dock while the captain was "walking" the vessel over to the dock. Thus, the Court finds that, considering the evidence and testimony presented, Captain Ruffin did not have a duty to affirmatively warn Gonzales that the vessel would bump against the dock in these circumstances.

Likewise, to the extent that Gonzales argues that Captain Ruffin should have warned Gonzales not to climb onto the offloading platform while the vessel was moving, the Court finds that such conduct also constitutes an "open and obvious" risk. The Court credits Captain Ruffin's unchallenged testimony that passengers should not climb up onto the offloading platform until the captain signals for them to do so.[142] Thus, in light of this direct prohibition and the obvious risks of standing while the vessel is moving on a raised, open-ended platform meant to only assist in disembarking from the vessel, as well as Gonzales' extensive experience on vessels, the Court

---

[140] *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 159:10–159:20, 181:17–181:25.

[141] *See* Test. of Todd Ferniz, Trial Tr., Oct. 24, 2016, at 104:8–104:12.

[142] *See* Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 122:13–123:3 (stating that passengers "shouldn't get up [on the offloading platform] until I tell them to get up there" and that the captain would do that every time a passenger got on the platform); *see also* Test. of Perry Triche, Trial Tr., Oct. 24, 2016, at 82:23–82:25 (Q: "When that transfer is being made—I would assume you have to wait until it's safe to do that. Wouldn't you?" A: "Yes, sir.").

finds that Captain Ruffin did not have a duty to affirmatively warn Gonzales to not board the offloading platform while the vessel was moving.

While Gonzales cites to several cases in which courts found that a presumption of negligence exists when a vessel allides with a fixed object, each of the cases is distinguishable, as they involved situations where the only explanation for hitting the fixed object was poor seamanship and negligence.[143] In *Bunge Corporation v. M/V Furness Bridge*, the Fifth Circuit explained that the "common sense behind the rule makes the burden a heavy one," as "[s]uch accidents do not occur in the ordinary course of things unless the vessel has been mismanaged in some way."[144] Here, the testimony established that bumping against the dock does in fact "occur in the ordinary course of things" when "walking" the vessel over to a dock.[145] Thus, the Court concludes that, in the facts and circumstances of this case, Gonzales has not established that he is entitled to a presumption of negligence merely because the vessel bumped into the dock. To the extent that he is entitled to such a presumption, the Court further determines that River Ventures has rebutted the presumption.

---

[143] *See Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 793 (5th Cir. 1977) (determining that there was a presumption of fault when a "supertanker" struck a mooring dolphin that it should not have touched when attempting to dock); *Freund v. The Chauncey M. Depew*, 45 F. Supp. 263, 265 (S.D.N.Y. 1942) ("In the absence of some intervening cause, a vessel does not, in broad daylight under normal weather and tide conditions, collide with a pier with such force as to materially damage the pier and injure passengers on the vessel, unless there was poor seamanship, and the Depew's collision with the pier plainly was the result of poor seamanship. The circumstances permit no other conclusion."); *Kornreich v. City of N.Y.*, 1958 WL 92168 (N.Y. Sup. Ct. Feb. 20, 1958) (finding that the defendant's ferryboats hit a pier's pilings because of the defendant's negligence, as the defendant failed to offer any proof as to controvert the plaintiff's evidence or otherwise explain why the boat hit the pier).

[144] *Bunge Corp*, 558 F.2d at 793.

[145] *Id.*

Next, the Court further notes that, even crediting Gonzales' testimony that the bumps were "real hard,"[146] the Court finds that Gonzales failed to establish that the bumps were so hard as to constitute a breach of duty, *i.e.* that Captain Ruffin did not exercise reasonable care under the circumstances of this case. As the Fifth Circuit determined in *Daigle v. Point Landing, Inc.*, a moving vessel does not breach its duty to its passengers when the master or captain did not "[know] or [have] reason to suspect the vessel's maneuvering in the river endangered the plaintiff's safety."[147] There, the Fifth Circuit held that the vessel's movement only jeopardized the plaintiff's safety because the plaintiff was operating a defective winch without a protective cover, without informing the master or crew that he was doing so, and without instructing the master or crew to cease maneuvering the vessel.[148]

Here, Captain Ruffin testified that he did not know that Gonzales had climbed to the top of the offloading platform,[149] and no witness testified that Gonzales told Captain Ruffin that he was going to climb onto the offloading platform while the vessel was moving or that Captain Ruffin ever signaled Gonzales that it was safe to do so. Moreover, there was no testimony as to how long Gonzales was on top of the offloading platform or that Captain Ruffin should have been checking to make sure Gonzales had not prematurely climbed up to the platform while he was simultaneously "walking" the vessel. In fact, Captain Ruffin testified that he would have been

---

[146] *See* Rec. Doc. 86 at 2–3; Rec. Doc. 43 at 9; *see also* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 167:13–168:12 (stating that the vessel came into contact with the dock with enough force to throw him sideways off the platform and onto the dock).

[147] *Daigle*, 616 F.2d at 827.

[148] *Id.*

[149] *See* Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 143:1–143:5, 151:3–151:5 (stating that he thought Gonzales was at the stern of the ship and that he did not see him when he got up to the top of the platform).

unable to both "walk" the vessel and keep an eye on every passenger simultaneously, and the Court finds such testimony persuasive.[150] Rather, the only testimony that establishes that Captain Ruffin knew that Gonzales was on top of the platform before Gonzales jumped comes from Captain Ruffin himself, who testified that Ferniz told him that Gonzales was about to jump right before it occurred and without any opportunity to stop the vessel.[151] Accordingly, the Court finds that Gonzales has failed to establish that Captain Ruffin "knew or had reason to suspect the vessel's maneuvering in the river endangered [Gonzales'] safety," as the Court is persuaded that Captain Ruffin was not aware that Gonzales was not on the stern of the deck with Ferniz.[152]

To the extent that Gonzales argues that the "hard" bumps would have constituted a failure to exercise reasonable care in the instant circumstances even if he had not been on top of the offloading platform, the Court determines that there was insufficient evidence presented to support such a finding. There was no testimony that Captain Ruffin was "walking" the vessel too fast or was otherwise improperly maneuvering the vessel in light of the fact that the river was "rough" and "running high" that day. Nor was there any expert or credible lay testimony that the bumps were so forceful as to evidence a failure to exercise reasonable care regardless of where Gonzales was standing. Likewise, there was little to no corroborating evidence that Captain Ruffin bumped the M/V TROOPER against the dock too hard for those circumstances, such as evidence of damage to the vessel or the dock or testimony from Ferniz that he was also thrown by the force of the bumps while he was on the back deck. In fact, the Court notes that, despite having already felt

---

[150] *See id.* at 154:18–155:5.

[151] *See id.* at 128:10–129:11.

[152] *Daigle*, 616 F.2d at 827.

three "hard" bumps, Gonzales testified that he did not use his "stop-work authority" or step away from the edge of the platform, both of which undermines Gonzales' contention that the bumps were too hard in those circumstances.

In other words, in light of the river's conditions that day and the established routine nature of bumping against the dock while "walking" a vessel to the dock, Gonzales has not established by a preponderance of the evidence that these bumps were so hard that they constitute a failure to exercise reasonable care under the circumstances by River Ventures. It was Gonzales' burden to show that the bumps against the dock were of such force that they crossed the line from an ordinary occurrence while docking into an act of negligence; Gonzales failed to do so.

Rather, as discussed *infra*, in light of the testimony and evidence presented and the relative credibility of each witness, the Court finds that Gonzales' injuries arose not from any breach of duty by River Ventures, but because Gonzales: (1) improperly climbed onto the offloading platform while the vessel was still moving and without Captain Ruffin's permission; (2) failed to inform Captain Ruffin that he was climbing onto the platform; and (3) attempted to jump down to the dock before Captain Ruffin finished "walking" the vessel into position so that Gonzales could safely disembark. Accordingly, the Court finds that Gonzales failed to establish by a preponderance of the evidence that River Ventures breached its duties to Gonzales during the events of June 17, 2014.

## C. *Causation*

The Court further finds that, even if River Ventures' conduct constitutes a breach of its duties to Gonzales, Gonzales has failed to establish by a preponderance of the evidence a causal connection between the alleged breach and Gonzales' injury. "Under the general maritime law, a

party's negligence is actionable only if it is the 'legal cause' of the plaintiff's injuries, which is something more than 'but for' causation —the negligence must be a substantial factor in causing the injuries."[153]

Here, Gonzales testified that he was thrown from the vessel onto the dock when Captain Ruffin bumped against the dock on his fourth attempt at "walking" the vessel, and thus River Ventures' alleged negligence was causally connected to Gonzales' injury.[154] However, as stated *supra*, the Court finds the testimony of Todd Ferniz, the only other eye witness to Gonzales' actions who testified, to be the most credible. Ferniz, like Gonzales, is an employee of UBT.[155] Despite his connections to both the plaintiff and the intervening parties, Ferniz testified that: (1) while Captain Ruffin was attempting to "walk" the vessel over to the "F boom" dock, Gonzales climbed onto the offloading platform;[156] (2) while Captain Ruffin was still trying to properly position the vessel, it appeared that Gonzales was going to jump down to the dock while the vessel was moving;[157] (3) he yelled to Gonzales to not jump;[158] and (4) Gonzales jumped down to the dock, landed on his shoulder, and injured himself.[159] Immediately after the incident, while the

---

[153] *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 213–14 (5th Cir. 2010) (quoting *Donaghey v. Ocean Drilling & Explor. Co.,* 974 F.2d 646, 649 (5th Cir.1992)) (internal quotation marks omitted); *see also DePerrodil v. Bozovic Marine, Inc*, No. 13-849, 2015 WL 8542829, at *2 (W.D. La. Dec. 10, 2015) (noting that both factual causation and proximate causation must be established to support a negligence claim under general maritime law), *aff'd in part, vacated in part on other grounds, remanded sub nom. Deperrodil v. Bozovic Marine, Inc.*, 842 F.3d 352 (5th Cir. 2016)

[154] *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 165:4–165:15.

[155] *See* Test. of Todd Ferniz, Trial Tr., Oct. 24, 2016, at 89:8–90:14.

[156] *See id.* at 95:1–95:13.

[157] *See id.* at 101:1–102:2, 108:1–108:22.

[158] *See id.* at 101:1–102:2, 108:4–108:25.

[159] *See id.* at 95:15–95:20, 101:1–102:2.

incident was fresh in his mind, Ferniz also told Captain Ruffin that Gonzales had jumped from the offloading platform down to the dock.[160] Moreover, that same day, Ferniz prepared a written statement in which he reiterated that: (1) Gonzales "pursued to jump;" (2) Ferniz "told him not to" and "to wait until it is stable;" and (3) on the fourth attempt by Captain Ruffin to dock the vessel, Gonzales "jumped onto a pile of rope" and "landed on his shoulder."[161] At trial, Ferniz testified that "pursued to jump" meant that he saw Gonzales in a jumping stance and getting ready to jump.[162]

Furthermore, Ferniz's recollection and testimony remained unchanged at trial over two years later: that Gonzales was up on the offloading platform while the vessel was moving and that he decided on his own to jump down to the dock while Captain Ruffin was still docking the vessel.[163] The only contradicting eye witness testimony that Gonzales was thrown from the vessel comes from Gonzales himself. However, the Court finds Gonzales' testimony unpersuasive and less credible in light of Ferniz's consistent and repeated testimony and the absence of corroborating evidence that Gonzales was thrown from the boat or that the boat was moving fast enough or hit the dock hard enough to do so. Furthermore, the Court found Gonzales' testimony and recollection to be less credible because he was unable to remember certain details of the alleged fall, such as landing on a pile of rope.[164]

---

[160] *See* Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 146:17–146:23 ("Todd told me he jumped.").

[161] *See* Test. of Todd Ferniz, Trial Tr., Oct. 24, 2016, at 101:1–101:11; Defendant's Exhibit Number Three, at 1 (Statement of Todd Ferniz).

[162] *See* Test. of Todd Ferniz, Trial Tr., Oct. 24, 2016, at 108:8–108:11.

[163] *See id.* at 102:12–103:2, 108:4–109:16.

[164] *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 197:1–197:8 ("I don't remember the rope.").

The Court notes that Gonzales' orthopedic surgeon, Dr. Charles Haddad, testified that Gonzales' story is consistent with his injuries and that Dr. Haddad's "assumption" is that someone who jumps from a vessel is "more likely" to have "some lower extremity injuries."[165] However, the Court finds such testimony has little persuasive value, as Dr. Haddad only testified as Gonzales' treating physician for his shoulder injuries and was not offered as an expert witness on such causation issues. There was also no evidence presented that Dr. Haddad prepared any report or analysis to support his opinions. Moreover, on cross examination, Dr. Haddad conceded that his notes on how the incident occurred were based solely on his interview with Gonzales and that it was "possible" that the injury occurred in a different manner.[166]

Accordingly, the Court finds that Gonzales has failed to establish that any alleged breach of duty by River Ventures was sufficiently causally connected to Gonzales' injuries. That is, even assuming it was a breach of duty for, *inter alia*, Captain Ruffin to bump hard against the dock, to fail to warn the passengers to watch for the bump or to not prematurely board the offloading platform, or to fail to proceed to an alternative drop off location, Gonzales has not established that his injuries were sufficiently caused by anything other than his own decisions, mainly: (1) to climb up to the offloading platform without informing Captain Ruffin or getting Captain Ruffin's permission and in contradiction to established safety procedures; and (2) to jump down to the dock before the vessel had stopped moving and before the captain had signaled that he could disembark. This is particularly true in light of Gonzales' extensive maritime experience and the fact that

---

[165] *See* Test. of Charles Haddad Jr., Trial Tr., Oct. 24, 2016, at 224:2–224:21.

[166] *See id.* at 257:3–257:19.

Gonzales had already felt up to three bumps against the dock and did not step farther back on the offloading platform or use his "work-stop authority" to end the maneuver; instead, he jumped on Captain Ruffin's fourth attempt to dock the vessel.[167]

Additionally, the Court notes that, even if the Court were to find that Gonzales did not jump, he has failed to carry his burden of establishing that his injuries were caused by anything other than his decision to climb onto the platform when he was not supposed to and while the vessel was docking. In sum, Gonzales has failed to establish by a preponderance of the evidence that River Ventures' alleged negligence caused his injuries. Therefore, considering the evidence presented, the Court finds that Gonzales has not carried his burden of proof in this case, and thus River Ventures is not liable for Gonzales' injuries pursuant to Section 905(b) of the LHWCA or under General Maritime Law.

## IV. CONCLUSION

For the reasons above, the Court finds that Gonzales has failed to establish by a preponderance of the evidence that River Ventures breached a duty to Gonzales or that any alleged negligence of the vessel caused Gonzales' injuries. Thus, the Court concludes that River Ventures is not liable for Gonzales' injuries pursuant to Section 905(b) of the LHWCA or under the General Maritime Law. Accordingly,

---

[167] *See* Test. of Angelo Gonzales, Trial Tr., Oct. 24, 2016, at 184:6–185:5, 190:24–192:4; Test. of Perry Triche, Trial Tr., Oct. 24, 2016, at 68:11–69:20, 70:3–70:20; Test. of Todd Ferniz, Trial Tr., Oct. 24, 2016, at 111:18–112:5; Test. of Noble Ruffin, Trial Tr., Oct. 24, 2016, at 148:6–148:22.

**IT IS HEREBY ORDERED** that there be judgment in favor of Defendant River Ventures and against Plaintiff Angelo Gonzales on all of Gonzales' claims against River Ventures.

**NEW ORLEANS, LOUISIANA**, this __14th__ day of April, 2017.

*Nannette Jolivette Brown*

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**